HARSTELL OPERATING CO., D. B. A. 730 LOUNGE BAR, *v.* LIQUOR CONTROL COMMISSION OF OHIO.

(No. 218460—Decided July 30, 1964.)

*Messrs. Topper & Alloway*, for appellant.
Mr. *William B. Saxbe*, attorney general, and Mr. *Larry G. Brake*, for appellee.

HARTER, J. This matter is in the court by way of an appeal under Section 119.12, Revised Code, from an order of the Liquor Control Commission upon a hearing on a citation asserting five violations of regulations of the commission. The commission found, on the evidence adduced before it, that the Department of Liquor Control had proven violations numbered 1, 3 and 5 by the requisite evidence but had failed to prove violations 2 and 4. On these findings, the commission ordered a 100-day suspension as to each of the three violations, such suspensions to run concurrently.

There is a measure of confusion in the record and the briefs as to which violation bears which number but, under the view which I take of this record, this confusion is not truly significant. I will attempt to describe the problems in general and without too much attention to numbers.

The violations which were found by the commission to have been established by the evidence related to activities within the permit premises on June 20, 1963, July 1, 1963 and July 23, 1963.

As to the activity of June 20, 1963, it was claimed that one of the permit holder's employees or agents solicited a patron "to buy her a drink" of intoxicating liquor, in violation of the

first sentence of regulation 59. As to the July 1, 1963, episode, it was asserted that one of the permit holder's employees or agents *permitted* the solicitation of a patron to "buy her a drink," in violation of the second sentence of regulation 59. The third of these claimed violations (numbered 5 in the citation) alleged that the permit holder or its responsible agents permitted loitering within the permit premises by an intoxicated person in violation of regulation 52.

In considering the record relating to these three claimed violations, I will first treat of the last claimed violation—that of allowing an intoxicated person to loiter within the premises. The pertinent language of regulation 52 is:

"No permit holder shall knowingly or wilfully allow in, upon or about his licensed premises improper conduct of any kind * * *."

This regulation has been in effect in this form since 1950. We have to assume that loitering by an intoxicated person is improper conduct. The regulation deliberately uses the expression "knowingly or wilfully allow." By using such a phrase, the promulgators of the regulation must be assumed deliberately to have required *scienter*, or knowledge, and affirmative action, or nonaction, consciously willed, to constitute a violation of the regulation. To make out a case of allowing an intoxicated person to loiter in permit premises, the Department of Liquor Control must produce evidence to the effect that the permit holder's responsible agent or representative *had actual* or *constructive* knowledge of the presence of an intoxicated person within the premises at a time when such responsible representative could have acted effectively to remedy the problem but did not do so. I fully explained my theories on this point in a case decided in 1961 in this court, entitled *Mendlowitz* v. *Board of Liquor Control*, No. 209395. Rather than repeat my reasoning here, I direct the attention of the persons who may be interested in the details of my theory to that opinion.

With these background comments on the law applicable to this alleged violation, let us next consider the evidence which was adduced on this point before the commission.

Ralph E. Krieger, the investigator in charge of the Cleveland district of the Ohio Department of Liquor Control, and one police officer, were the only department witnesses who testified

regarding this 5th charge. Krieger related that he entered the premises on July 23, 1963, with another investigator and three Cleveland police officers (none of these four testified) to serve a citation on the manager. Krieger further stated that he observed a man named Carl Kuni first when he was in the corridor leading to the men's rest room at the rear of the premises—that Kuni was approaching the door of the girls' dressing room where he was stopped by police officers. Kuni was truly intoxicated, apparently, although appellant's manager denies it, and we will assume the fact of his intoxication, but that, *alone*, is not enough. We must go on to see what knowledge of his condition was brought to the attention of the permit holder's responsible representatives at a time when they could have expelled him but failed to do so. The record expressly shows that the witnesses did not know how Kuni got into this corridor, where he had come from, whether he had obtained the liquor which made him intoxicated in these premises, or elsewhere, and no effort was made to show *any knowledge* of his condition on the part of any of the permit holder's representatives prior to his spontaneous appearance, and arrest, in the back corridor. For example, the policeman witness gave the following testimony:

"Q. Mr. Kennelly, you don't know where he was immediately before you saw him in the back corridor, do you? A. No, sir, I don't.

"Q. So you don't know whether he had been observed by anyone in connection with the 730 Lounge before that time, do you? A. No, Sir, I don't."

The explanation of this occurrence, if one is needed, came from the manager of this permit holder's business. Such manager testified that his attention was first called to Mr. Kuni "when he walked in the door with the state agents, and the two city policemen. All these men, including Kuni, walked to the back of the premises and were all the way out of the bar room and in the corridor near the washrooms when the state agents and police discovered Kuni was with them." The manager went on to describe how the policemen then arrested Kuni and pinned him against the wall, hurting his elbow. Kuni wanted to know what he had done—he said he had just come in to use the rest room. The agents for the state and the police had Kuni *in their custody, inside* these premises, about 25 minutes. Under these

circumstances, it is conclusively apparent that there was no opportunity for appellant's representatives to have done anything about evicting Kuni. Kuni was then the creature of the enforcement officers, not of the permit holder's representatives. This requires a reversal of this phase of the commission's order because of this significant gap in the evidence. We must hold that this part of the commission's order was not supported by reliable, probative or substantial evidence—indeed, by *any* evidence, and therefore this part of the order is not in accordance with law.

It is appropriate, next, that we recite the facts developed at the commission's hearing relating to charges 1 and 3—that "employees" solicited drinks from patrons, and that responsible representatives of the permit holder *permitted* strangers to solicit patrons for drinks. It is asserted that two dancers, referred to as "Debbie" and "Cha Cha Nova," were the ones who did the soliciting. The department's investigator, George Baker, testified that he was on the permit premises on June 20, 1963, under instructions from Colonel Floyd Moon, Enforcement Chief, using the name "Gene Bradford," and that he entered about 1:10 a. m. He seated himself at the bar and ordered a drink. After a few minutes, a girl came over to him and said: "My name is Cha Cha. May I join you, may I have a drink with you?" Baker testified that he later observed this girl performing a dance on the premises—that she talked with an accent, and stated that she was Puerto Rican. Baker stated that, at the time of this conversation, the bartender, whom he was unable to identify except as "Lenny," was about two or three feet away, and that the order was given in a loud tone of voice.

A second Liquor Control Department investigator named Thompson testified that, on the same night, he was in the permit premises and saw George Baker talking to an entertainer named "Cha Cha."

Baker further testified that, on that evening, he saw investigator Thompson talking to a girl named "Debbie" for whom Thompson bought some drinks. Thompson testified that Debbie approached him, introduced herself and asked if he would buy her a drink of rum, which he stated he did. He related that, as he had entered the premises he had seen Debbie standing between the bar and the cloakroom and that she was a "hatcheck girl."

(The payroll records in evidence do not, incidentally, even hint at any "hatcheck girl" being employed at that time of year—June.) Thompson identified Leonard Cohen as the bartender who sold him the drinks and stated that, when he talked with Debbie, the bartender was about two feet in front of them on the other side of the bar.

At the July 1, 1963, incident it was an entertainer named "Kim" who did the soliciting as well as "Debbie." This time the investigators were uncertain where the bartender was when the soliciting occurred.

There were denials of these occurrences in the testimony from the witnesses produced by the permit holder, and the requests that the two investigators identify "Cha Cha" and "Debbie" among some seven girls, produced at the commission's hearing, were anything but satisfactory. The two investigators were not in agreement on this and they even disagreed on their evidence as to the "Kim" episode itself. Baker said that Thompson and Kim were already seated and drinking when Baker arrived. Thompson testified this was not true. I do not attach too much significance to these shortcomings in the department's evidence, because my conclusions are based upon points of *law*, not *fact*, but there is some real question in my mind as to whether testimony such as this rises to the dignity of "reliable, probative, substantial" evidence, as required by Section 119.12, Revised Code.

As just stated, I feel this appeal must be decided on points of law, not fact. I assume that the commission believed the department's witnesses and disbelieved the appellant's witnesses. Even if this is done, however, there is, in my opinion, no evidence in the record to support findings No. 1 and No. 3. This conclusion grows out of the proposition that both investigators were testifying as to activities of female entertainers who, according to the well-settled practices of night clubs in Cleveland, were "independent contractors," not "employees." If "Debbie" was not an entertainer, she was not an employee. She may have been merely a patron, herself. It was established without dispute that the appellant contracted with a talent agency, The Pan American Booking Agency, to furnish entertainers, particularly dancers, as "independent contractors." None of the entertainers was carried on the payroll as employees; no

deductions were made for federal withholding or social security taxes. Such entertainers furnished their own costumes and performed the dances in which they specialized. The rules of their union (the National Guild of Variety Artists) specifically forbade them from soliciting patrons of the clubs to buy them drinks. Between performances, their time was their own. All in all, I hold that the permit holder's "right of control" over them was shown to have been missing.

Under these facts, we must consider the law as it relates to charges 1 and 3 in the citation.

Regulation 59 of the Board of Liquor Control which became effective July 5, 1950, provides:

"The holder of a permit issued by the department shall not, nor shall any of his agents or employees solicit or in any manner approach a patron for the purchase of drinks of beer or intoxicating liquor for himself or such agent or employee or any other person. The holder of a permit issued by the department shall not permit any person not in his employ to solicit or in any manner approach a patron for the purchase of drinks of beer or intoxicating liquor either for himself or for any other person."

This Regulation has been considered by the courts several times. I will consider in some detail two court decisions which I deem material to the facts of this case.

In 1959, Robert M. Draper, while a judge of this court, rendered a four-page decision in the case of *Roxy Musical Bar, Inc.,* v. *Board of Liquor Control,* No. 202700, where it was asserted that the permit holder and/or its agent or employee "did approach and solicit in and upon the permit premises patrons to purchase intoxicating liquor for themselves or other persons * * *."

I quote a portion of Judge Draper's decision there:

"In this case the evidence shows, by the requisite amount, that Bernice H. Sadberry did solicit drinks.

"That, however, is not sufficient as the board (actually the department) must prove by virtue of its charge that Bernice H. Sadberry was an agent or employee of the permit holder.

"The Board saw fit by the charge filed to eliminate the other part of regulation 59 which relates to permitting any person to solicit drinks.

"The only question for this court to determine is: was Bernice H. Sadberry an employee or agent of the permit holder?

"The evidence of the Department of Liquor Control showed that Bernice H. Sadberry did solicit a drink.

"There is no evidence that Bernice H. Sadberry was an agent or employee."

After quoting, verbatim, the testimony in that record as to Bernice H. Sadberry being an "entertainer" who was hired for this place of business by a "booking agent," Judge Draper used the following language:

"The department did not see fit to inquire further into the relationship, as to whether she was or was not an employee or agent. This could have been done by inquiring as to her duties; the right of control; whether she could be fired; whether she was under contract; how she was to be paid.

"The department had the legal duty to prove all the elements of their case, to substantiate the charge; this they failed to do."

From Judge Draper's ruling to this effect, no appeal was taken. Accordingly, it stands as a persuasive precedent which should control me, as another judge of the same court, on a *stare decisis* basis. It should also control the Department of Liquor Control *and* the Liquor Control Commission in their dealings with comparable problems.

It should be remembered that Judge Draper, in the last language quoted above, pointed out that the department should have inquired into the relationship between the "entertainer" and the permit holder more extensively. We have an example of what can sometimes be developed when specific questions *are asked* in developing the "entertainer-independent-contractor" relationship in a decision by our Court of Appeals in the case of *Mann, Inc.,* v. *Board of Liquor Control,* No. 7055, as decided February 13, 1963. Judge William C. Bryant wrote the opinion for a unanimous court there. A part of his decision related to claims of habitual and continuous permitting of the solicitation of patrons for the purchase of drinks of beer or intoxicating liquor in violation of regulation 59. As Judge Bryant observed in his opinion, the essence of the complaint there was that girls appearing in the night club, as entertainers, solicited drinks from patrons.

In his opinion, Judge Bryant quoted, verbatim, two full pages of question-and-answer testimony from the manager of the night club, concluding with the following:

"Q. In other words, you have quite a bit of control over these entertainers, do you not? A. Yes, Sir."

Here is the "right of control" which Judge Draper deemed so significant, and which the law generally deems the essence in establishing the relationship of employer-employee. The "right of control" does not exist to the same, or any real extent in the "independent contractor" relationship.

Judge Bryant found, on the evidence in the record before him, that the entertainers were employees; Judge Draper would probably have come to the same conclusion if the evidence in his case had been more detailed and had tended, either expressly or by necessary implication, to show that the permit holder had the right of control over the entertainers who did the soliciting of patrons for drinks.

These two decisions, one in our court and one in the Court of Appeals, are deemed particularly significant by me because (1) they show both sides of this "entertainer-independent-contractor" problem in connection with the policing of permit premises, and (2) they were both rendered in connection with permit premises *in downtown Cleveland*. This second point is important to me because the appeal in the case now being considered is from an order of 100 days supension at a downtown Cleveland location. The investigators of the Ohio Liquor Department were clearly under a mandatory duty from our court and the Court of Appeals, to procure the requisite evidence to prove the charges in the citation. This included the procuring of evidence to break down the independent-contractor relationship which is implied in the term "entertainer" as applied to dancers in Cleveland permit places. The investigators were under such duty if they were solely relying upon the claim that such "entertainers" were employees or agents who were asking patrons to buy them drinks. In other words, if the evidence showed they were merely "entertainers" and thus, by legal implication, "independent contractors," the citation would not be proved, and the Department of Liquor Control should know this through the courts' earlier decisions.

If, on the other hand, the investigators were operating upon

the theory that the second sentence of regulation 59 was being violated, we have a different problem of law. As I see it, the second sentence of this Regulation is valid and enforceable as a proper exercise of power, in the general welfare field, in attempting to prohibit a proprietor from permitting solicitation by strangers to the permit holder of drinks of intoxicating liquor, or beer, from other patrons within the permit establishment. I base my conclusion that this second part of the regulation is valid, enforceable and constitutional upon the rules of law explained in *Morissette* v. *United States* (1952), 342 U. S. 246, 96 L. Ed. 288, 72 S. Ct. 240.

Assuming, as I do, that the regulation is valid, I must next consider what the regulation actually means under prior decisions by our courts. It provides, by language deliberately chosen by the Board of Liquor Control in 1950, and continued in effect to the present time, that a permit holder "shall not *permit* any person not in his employ to solicit or in any manner approach a patron for the purchase of drinks * * *." I emphasize the word "permit" because that word has always implied some affirmative action or participation on the part of the permit holder or his responsible agent. The Attorney General's brief in support of the commission in at least one appeal in this series of cases, concedes that to "permit" means to "allow or tolerate." He further concedes that if the action contended for takes place and the permit holder or his responsible agent has knowledge of it and goes ahead and sells the drink and does nothing to stop *further* solicitation, *then* a violation has occurred.

The regulation could have recited, in effect, that, "There shall be no solicitations of drinks by any person within the premises." This language would attack the independent contracting dancer situation head-on and could have made the permit-holder an insurer, at his peril, that there would be no such solicitation in his place of business by the dancers, or anyone else. But, as pointed out above, the regulation does not so provide; it speaks of a proprietor's *permitting* the solicitation.

If there is to be a "permitting of soliciting drinks," there must be a showing by competent evidence that the proprietor, or his responsible agent, knew of the soliciting at a time when such proprietor or his responsible agent, could have acted

so as to prevent it. In other words, a single, spontaneous solicitation to buy a drink, made by some one not an employee of the proprietor, to a patron—standing alone in the evidence—would not necessarily be enough to bring the case within the second sentence of regulation 59 because it would not amount to a "permitting" within its legal contemplation.

These propositions of law have been enunciated many times by our Franklin County Courts. A few citations should suffice.

Judge Myron B. Gessaman of our court so held in *Modern Grill, Inc.*, v. *Board of Liquor Control*, in 1955 in case No. 190819; Judge Dana F. Reynolds of our court so held in *Mercurio* v. *Board of Liquor Control* in 1958 in case No. 199918; and our Court of Appeals applied parallel rules in *Kosich* v. *Board of Liquor Control* (1955), in case No. 5302, and in *Smith* v. *Board of Liquor Control* (1954), 96 Ohio App. 396. These cases are, of course, distinguishable from the case of *Wittenberg* v. *Board of Liquor Control* (1948, App., Franklin Co.), 52 Ohio Law Abs. 65, where constructive knowledge on the part of the permit holder was established, according to the court's finding. It is, relatively, a rare case where a course of conduct has continued so long and so notoriously that constructive knowledge is established.

The department is apparently contending that the circumstantial evidence as to the proximity of the bartender when a solicitation was made, is enough to make out the charges of "permitting" solicitation. I do not find evidence of actual participation in the solicitation by the bartender, so it must be a "permitting" contention that the department relied upon.

It is well settled that circumstantial evidence is a proper vehicle of proof in a proceeding before an administrative agency, such as the Liquor Control Commission, as well as in court. However, as pointed out in the case of *Ross* v. *Board of Liquor Control* (1954, App., Franklin Co.), 72 Ohio Law Abs. 415, Headnote 2, "A theory may be established by circumstantial evidence where *the only reasonable conclusion* that can arise is the theory sought to be established."

The facts in our case must be tested by this "only reasonable conclusion" yardstick. It should be self-evident that, if a patron should ask an entertainer—one of these independent-contracting-exotic dancers—to join him in a drink, the patron

could buy her a drink, and there would be absolutely no wrong-doing on the part of the bar maid in serving the drink to her. It is only when the entertainer is the aggressor in asking the patron to buy her a drink that the bartender, with knowledge directly or circumstantially of the entertainer's aggression in making the solicitation, that there is wrongdoing by the bartender in "permitting" the solicitation. Circumstantial evidence to the effect that a bartender *might have heard* the aggressive language of solicitation does not satisfy the "only reasonable conclusion" test of the *Ross* decision, and it does not convince me that there was substantial, probative and reliable evidence to support the Commission's finding to the effect that the bartender, as appellant's responsible agent or employee, *did permit* these July 1, 1963 solicitations.

Since there is a vital failure of proof, a reversal is required as to charges 1 and 3.

For the reasons stated in this opinion, I feel compelled to reverse the order appealed from on the ground that it is not supported by probative, reliable and substantial evidence and is not in accordance with law. The mandate of Section 119.12, Revised Code, requires such result.

*Order reversed.*